UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NORMAN WILLIAMS,                  :
                                  :CIVIL ACTION NO. 3:15-CV-848
          Plaintiff,              :
                                  :(JUDGE CONABOY)
          v.                      :
                                  :
CAROLYN W. COLVIN,                :
Acting Commissioner of            :
Social Security,                  :
                                  :
          Defendant.              :

_____

**MEMORANDUM**

Here the Court considers Plaintiff's appeal from the
Commissioner's denial of Supplemental Security Income ("SSI") under
Title XVI of the Social Security Act.  (Doc. 1.)  Plaintiff filed
for benefits in June 2012 alleging disability beginning on April 4,
2008.  (R. 15.)  He later amended his alleged onset date to June
28, 2012.  (*Id.*)  A July 2, 2012, Disability Report indicates that
Plaintiff claimed his ability to work was limited by arthritis,
high blood pressure, IBS, depression, and hernia.  (R. 198.)

The Administrative Law Judge ("ALJ") who evaluated the claim,
Peter V. Train, concluded Plaintiff had the severe impairments of
degenerative joint disease of the right foot and depression.  (R.
17.)  He noted that Plaintiff also had hypertension, diabetes,
hyperlipidemia, and abdominal pain but the record did not support
that these impairments were severe.  (*Id.*)  He found that the
record did not support that the claimed impairments of PTSD and
borderline intellectual were severe.  (*Id.*)  ALJ Train determined

that Plaintiff's severe impairments did not alone or in combination with other impairments meet or equal the listings.  (R. 17-18.) The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with certain nonexertional limitations and that he was capable of performing jobs that existed in significant numbers in the national economy.  (R. 18-23.)  The ALJ therefore found Plaintiff was not disabled under the Act.  (R. 23.)

With this action, Plaintiff argues that the decision of the Social Security Administration is error for the following reasons: 1) the ALJ erred by finding Plaintiff's multiple impairments to be "non-severe"; 2) the acting commissioner failed to sustain her burden of establishing that there is other work in the national economy that Plaintiff could perform; 3) substantial evidence does not support the ALJ's step three findings; and 4) the ALJ erred in assessing Plaintiff's credibility.  (Doc. 12 at 1-2.)  After careful consideration of the administrative record and the parties' filings, I conclude Plaintiff's appeal is properly denied.

## I. Background

### A.    *Procedural Background*

Plaintiff filed this action on May 1, 2015.  (Doc. 1.)  He appeals the denial of benefits made final by the March 2, 2015, Appeals Council denial of his request for review of the ALJ's decision.  (R. 1.)

2

Defendant filed her answer and the Social Security Administration transcript on June 30, 2015.  (Docs. 9-10.) Plaintiff filed his supporting brief on August 14, 2015. (Doc. 12.) Defendant filed her opposition brief on September 17, 2015. (Doc. 14.)  Plaintiff filed his reply brief on September 25, 2015.  (Doc. 15.)  Therefore, this matter is fully briefed and ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on January 23, 1965.  (R. 22.)  He has at least a high school education.  (*Id.*)  He has past relevant work as a production worker and industrial truck operator.  (Doc. 12 at 3.)

**1.   <u>Impairment Evidence</u>**

*a.   Right Lower Extremity*

On October 26, 2011, Plaintiff presented at Hamilton Health Center complaining of right foot pain.  (R. 283.)  A motor exam demonstrated no dysfunction and the reflexes were normal.  (*Id.*) The Assessment was limb pain and pathologic fracture of the right foot.  (*Id.*)  The plan included consultation with an orthopedic specialist.  (*Id.*)  Plaintiff was prescribed Vicodin and Tramadol. (*Id.*)

On November 2, 2011, Plaintiff reported that the Tramadol did not work and the Vicodin helped a little.  (R. 282.)  He also stated that he had broken his right heel in 2008 and had arthritis. (*Id.*)

3

On November 8, 2011, Plaintiff was seen by Michael R. Werner, M.D., of the Orthopedic Institute of Pennsylvania.  (R. 251.)  His chief complaint was "[r]ight hindfoot pain, 2008."  (*Id.*)  Dr. Werner recorded the history this complaint as follows: "This is a gentleman, 46 years old in prison, fell, fractured, shattered his calcaneus, offered surgery, held off, treated in a cast appropriately and healed with posttraumatic subtalar osteoarthritis, pain around the subtalar joint, uses a cane, calf atrophy, pain, not working . . . 8/10 pain."  (*Id.*)  Physical examination showed that Plaintiff had tenderness "to the point where he jumps into subtalar joint with essentially no subtalar motion, but tenderness at the joint.  Midtarsal joints not as tender, 5/5 strength in available range of motion, but calf atrophy, ligaments stable, stiff if anything and has a plantigrade foot."  (*Id.*)  Three views of the right foot showed "bone-on-bone osteoarthritis to the subtalar joint with calcaneal malunion" and the diagnosis was "calcaneal malunion with subtalar joint posttraumatic DJD."  (*Id.*)  Dr. Werner wanted to proceed with a subtalar fusion if Plaintiff stopped smoking.  (*Id.*)

Dr. Werner saw Plaintiff again on November 22, 2011.  (R. 253.)  Dr. Werner offered surgery but Plaintiff wanted to start with a brace, a decision with which Dr. Werner agreed.  (*Id.*)  He noted he would proceed with a Randy Stevens Arizona ankle arthritis brace.  (*Id.*)

4

On January 19, 2012, Plaintiff's ankle gait was antalgic, with palpitation and limitations in range of motion in his right lower extremity. (R. 279.)  Dr. Barbara Black diagnosed arthropathy of the ankle/foot. (*Id.*)

Medical records from the Dauphin County Prison show that on June 17, 2013, Plaintiff had no edema and minimal right ankle tenderness on range of motion. (R. 426, 440.)  Records from July 23, 2013, indicate the same. (R. 250.)

b.   *Other Physical Impairments*

Physical impairments which ALJ Train found to be non-severe are hypertension, diabetes, hyperlipidemia, and abdominal pain.[1] Because Plaintiff's objections do not specifically identify any error related to the ALJ's findings regarding these non-severe physical impairments, we need not review the evidence of record related to them.

c.   *Mental Impairments*

On February 15, 2012, Yury Yaraslavsky, M.D., of T.W. Ponessa & Associates Counseling Services, Inc., saw Plaintiff upon referral of Plaintiff's counselor at Sienna House, a halfway house. (R. 266.)  Plaintiff reported that he felt depressed and probably needed some kind of medication. (*Id.*)  Dr. Yaraslavsky reported

---

[1] The term hyperlipidemia means high lipid levels.  It includes several conditions but the use of the term generally means high cholesteral and high triglyceride levels. https://www.vascularweb.org/vascularhealth/Pages/hyperlipidemia.aspx.

the following "History of Present Illness":

> The patient is the only informant. Unfortunately, he is not a very good historian but I consider him being quite reliable.  The patient reported being depressed, "for a while."  The patient described having "a bad childhood" and a difficult life with a lot of jail time which he blamed for him being unhappy although lately, over the last 2-3 months, his depression got much worse.  The patient complained about losing over 15 lbs. over the last two months, having no appetite, not being ale to sleep, having very low energy, lack of interest, feeling sad, tearful, feeling guilty and quite anxious.  He denied any suicidal ideation or intention or plans but admitted that sometimes, "I'm going to say it.  I wish I'm not awake the next morning."  In addition, the patient started to experience for him some unusual symptoms.  Over the last few months, the patient started hearing voices.  They are low volume voices so the patient is not able to understand the content but it concerns him.  He also started seeing people and being paranoid.  On a few occasions, he believed that he had been followed and he was changing the way he was walking or hiding behind the dumpster.  Lately, he has avoided going outside because of a feeling of being followed.  At the same time, the patient told me he does not have any enemies and that other people don't share his beliefs.  The patient also described quite a high level of anxiety.  The patient reported he is still having nightmares and flashbacks about his past mostly they refer to him being brutally punished, beaten, by his stepfather.  His most recent triggers are the deterioration of his medical health and frustration with difficulty getting care.  He believes he needs.  The patient blamed people.  That nobody cares and it is very difficult to accomplish the tasks that he was planning.  He is currently living at a halfway house but he has a home plan and hopes to start living with his step-brother,

> if approved.  The patient is quite isolated.
> He has no support.

(R. 266.)  In the "Mental Status" section of his notes, Dr.

Yaraslavsky recorded that Plaintiff appeared pleasant and

cooperative with difficulty ambulating due to his arthritis. He was

coherent but

> [e]ye contact was very avoidant.  The patient
> showed some psychomotor slowness.  His mood
> and affect appeared depressed.  The patient
> had typical depressive content with a feeling
> of helplessness, guilt.  He also endorsed
> some paranoid delusions and auditory
> hallucinations.  He denied command
> hallucinations or hallucinations of other
> senses.  Insight and judgment appeared
> relatively well-preserved.  Thought process
> was linear.  The patient denied being
> suicidal or homicidal.  He appeared oriented
> x3.  His fund of knowledge seemed to be
> average.  Memory and concentration overall
> was intact.  The patient showed no abnormal
> or involuntary movements.

(R. 267.)

Dr. Yaraslavsky diagnosed "Major Depressive Disorder,

recurrent, severe, with psychotic features" and assessed a GAF of

45-50.  (R. 267.)  He started Plaintiff on Celexa for depression,

Trazadone for insomnia, and Risperdal for psychotic symptoms.  (R.

267-68.)  Plaintiff was to continue individual therapy at T.W.

Ponessa & Associates and continue medication management with Dr.

Yaraslavsky.  (R. 268.)

On April 18, 2012, Dr. Yaraslavsky recorded that Plaintiff

presented with "no complaints of depression which is lessening but

7

still exhibits auditory hallucinations." (R. 264.) Plaintiff was seeing a therapist on a regular basis. (*Id.*) Plaintiff's diagnosis and GAF remained the same. (*Id.*) Plaintiff's medications were changed: Celexa and Risperdal were discontinued and he was started on Prozac for depression and Geodon for psychosis. (R. 265.)

On May 23, 2012, Dr. Yaraslavsky recorded that Plaintiff presented with improvement and he was tolerating his medications with no problem. (R. 262.) Plaintiff continued to regard his depression as 8 of 10, and he said he had some residual auditory hallucinations but overall felt better and did not want to make any changes. (*Id.*) Dr. Yaraslavsky continued to rate Plaintiff's Major Depressive Disorder as severe. (*Id.*)

In July 2012, Plaintiff said that he felt better and graded his depression as 5 or 6 out of 10. (R. 302.) He denied significant psychotic symptoms but did hear voices once in a while. (*Id.*) Dr. Yaraslavsky reported that Plaintiff's mood and affect were mildly dysphoric. (*Id.*) He offered Plaintiff an increase in the Prozac dosage, but Plaintiff declined and Dr. Yaraslavsky noted that he would offer the same on Plaintiff's next visit. (R. 302.) At this visit, Dr. Yaraslavsky rated Plaintiff's depression as moderate and assessed a GAF of 50-55.

In September 2012, Dr. Yaraslavsky noted that Plaintiff described himself as doing well, and he denied being psychotic or

8

significantly depressed.  (R. 411.)  Patient wanted to continue with his treatment plan.  (*Id.*)  Dr. Yaraslavsky again rated Plaintiff's depression as moderate and assessed a GAF of 50-55. (*Id.*)

In November 2012, Plaintiff reported that he was depressed and attributed the depression to multiple medical and other problems. (R. 409.)  He had lost ten pounds due to hernia surgery and was recovering from that at the time of his visit.  (*Id.*)  Plaintiff wanted to continue his treatment plan unchanged.  (*Id.*)  Dr. Yaraslavsky assessed Plaintiff's Major Depressive Disorder to be recurrent/moderate.  (*Id.*)

On January 9, 2013, Dr. Yaraslavsky noted that Plaintiff described himself as doing well overall in terms of his depression but he was still preoccupied with his medical problems.  (R. 407.) He had an appendectomy about two weeks before and was still recovering.  (*Id.*) Dr. Yaraslavsky again diagnosed Plaintiff's Major Depressive Disorder to be recurrent/moderate.  (*Id.*)

On March 6, 2013, Plaintiff described himself as doing well. (R. 399.)  He reported that two months earlier he had an experience where he felt anxious and paranoid, believing that there were two men following him, but he denied being paranoid at the time of his March visit with Dr. Yaraslavsky.  (*Id.*)  Dr. Yaraslavsky's diagnosis continued to be Major Depressive Disorder, recurrent, moderate, and he assessed a GAF of 55.  (*Id.*)

9

On May 16, 2013, Plaintiff was seen by Vassili V. Arkadiev, M.D., of T.W. Ponessa & Associates and complained of feeling anxious, nervous and depressed. (R. 419.) Plaintiff admitted to helplessness and hopelessness and reported auditory hallucinations. (R. 420.) Dr. Arkadiev reported that Plaintiff's concentration was decreased, his attention was fair, and his affect appeared blunted, depressed, inappropriate, and guarded. (*Id.*) He also noted that Plaintiff had delusional ideas of persecution, his long term memory was fair, his intellectual functioning appeared below average, and he had a mild tremor. (*Id.*) Dr. Arkadiev diagnosed Plaintiff with Schizoaffective Disorder, Depressive type, Post Traumatic Stress Disorder, alcohol and marijuana dependence in remission, and borderline intellectual functioning. (*Id.*) He assessed Plaintiff's GAF at 50. (R. 421.) Dr. Arkadiev made some medication changes, including the addition of Latuda, encouraged Plaintiff to do psychotherapy, and planned to see him again in two weeks. (*Id.*)

Dauphin County Prison treatment records indicate that Plaintiff completed a Mental Health Screen on June 15, 2013. (R. 441.) Plaintiff answered "no" to all twelve screening questions. (*Id.*) He indicated that he did not have worries he could not get rid of, he did not feel like he was on an emotional roller coaster, he had never felt depressed for most of the day for at least two weeks, he had not been troubled by repeated thoughts, feelings, or

10

nightmares about something he experienced or witnessed, and he had never felt constantly on guard or watchful.  (*Id.*)

June 21, 2013, Dauphin County records indicate that Plaintiff reported to Enos Martin, M.D., that he had been prescribed medication for schizophrenia, his doctor had placed him on Latuda but he did not know why, and he also said he occasionally heard voices.  (R. 428.)  Objectively, Dr. Martin recorded that Plaintiff had a blunted affect, poor eye contact, did not respond to support, was not suicidal, and was not overly psychotic.  (*Id.*)  He diagnosed Plaintiff with Schizophrenia, Undifferentiated Type and his plan was to increase Plaintiff's Risperdal dosage.  (*Id.*)

On July 15, 2013, Dr. Martin noted that subjectively Plaintiff was doing better, he had some depression but was working on it, and he was content with his medications.  (R. 428.)  Objectively, Dr. Martin reported that Plaintiff had a blunted affect, a mild sense of humor, and he was not suicidal or delusional.  (*Id.*)  Because Plaintiff showed a bit more affect, Dr. Martin shifted Plaintiff's diagnosis to Schizoaffective Disorder and planned to monitor him. (*Id.*)

**2.   Opinion Evidence**

*a.   Examining Consultant*

Plaintiff had a consultative internal medicine examination with Thomas W. McLaughlin, M.D., on September 5, 2012.  (R. 314-24.)  Plaintiff's chief complaints were arthritis, high blood

pressure, and hernia.  (R. 314.)  Dr. McLaughlin noted in the
history portion of his report that Plaintiff had a calcaneal
fracture of the right heel in 2008 and was treated with casting.
(*Id.*)  He was advised to have surgery but did not.  (*Id.*)
Plaintiff reported that the pain had been increasing over the
preceding two years and he was continuing to be treated
conservatively with a brace but would agree to surgery if the brace
did not help.  (R. 314-15.)  He further stated that the brace and
cane were not helping.  (R. 315.)  Dr. McLaughlin also noted that
Plaintiff was on multiple medications for high blood pressure and
his hernia was due to be repaired in the near future.  (*Id.*)

Physical examination showed that Plaintiff presented with a
cane for ambulation into the examination room although he was able
to ambulate into the room without the cane.  (R. 316.)  Dr.
McLaughlin observed that Plaintiff's gait was somewhat antalgic
favoring his right heel and he wore a brace on his right foot and
ankle.  (*Id.*)  Plaintiff was able to stand unassisted, and rise
from the seated position and step up and down from the examination
table without difficulty or assistive devices.  (*Id.*)  Dr.
McLaughlin recorded a right inguinal hernia which was not easily
reducible.  (R. 317.)  He noted no evidence of muscle weakness or
atrophy.  (R. 318.)  He found that Plaintiff was able to engage in
appropriate conversation, answer questions appropriately and follow
directions and Plaintiff's affect was appropriate to the situation.

(*Id.*)  Regarding Plaintiff's gait, Dr. McLaughlin noted that Plaintiff was not able to walk on his heels or toes, not able to walk heel-to-toe, and he could not squat either with or without the brace.  (R. 318-19.)

Dr. McLaughlin's Impression/Plan was status-post calcaneal fracture with malunion and post traumatic arthritis, hypertension, right inguinal hernia, recently diagnosed hyperlipidemia and diabetes, and tobacco use.  (R. 319.)  He opined that Plaintiff had no lifting limitations, he could carry ten pounds frequently and twenty pounds occasionally, he needed a hand-held assistive device for balance and ambulation, he had no sitting limitations, and he was limited as to pushing and pulling with his right lower extremity.  (R. 323.)  Dr. McLaughlin concluded that Plaintiff could frequently bend, occasionally kneel and stoop, and never crouch, balance or climb.  (R. 324.)  "Heights" was the only environmental restriction noted.  (*Id.*)

b.  *State Agency Consultant*

Non-examining state agency psychologist Roger Fretz, Ph. D., opined on September 5, 2012, that Plaintiff's mental impairment did not satisfy the diagnostic criteria for listing 12.04 Affective Disorders.  (R. 74.)  He found that Plaintiff had mild restrictions in his activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of

13

decompensation.  (*Id.*)  Dr. Fretz concluded that Plaintiff was limited to unskilled work because of his mental impairment and he was not disabled.  (R. 80-81.)

**3.  Hearing Testimony**

ALJ Peter Train held a hearing on September 6, 2013, in Harrisburg, Pennsylvania.  (R. 29-68.)  Plaintiff and his attorney were present, as was Mr. Corporeale, a Vocational Expert.  (R. 29.) At the outset of the hearing, the ALJ explained to Plaintiff that he sought to determine if Plaintiff, who was incarcerated at the time, were not in prison, would he be able to engage in work activity.  (R. 31.)  Plaintiff was forty-eight years old at the time and confirmed that he had acquired a GED during a previous incarceration.  (R. 34.)

When the ALJ asked if Plaintiff's ankle bothered him when he was sitting, Plaintiff responded that he sometimes had to get up because it cramped up and this happened every forty-five minutes or so.  (R. 38.)  Plaintiff testified that he could walk approximately three blocks without his cane and could walk five or six blocks with it.  (R. 40.)  Plaintiff reported that he was taking two or three kinds of pain medication but the pain medications had stopped working.  (R. 40-41.)  He reported that he had some side effects from the medications including tiredness, dizziness, and some nausea.  (R. 41.)

When asked what he thought would happen if the ALJ got him a

14

job where he could sit or stand, work eight hours per day, with a
fifteen minute break in the morning and afternoon and one-half hour
for lunch, where he could occasionally miss a day or two a month
but essentially work eight hours a day five days a week, Plaintiff
responded that he thought it would be a "nice opportunity for me if
I can get something, I'll at least try and make it work out.  I
have been trying to, to do what's necessary."  (R. 48.)  Upon
questioning by his attorney about a full-time position, Plaintiff
added that he would need to be able to take a break for about ten
minutes and walk around if he got a leg cramp and he estimated this
could happen four or five times per day.  (R. 48-49.)

The ALJ asked the Vocational Expert ("VE") to assume an
individual who has "no limitations in lifting, in terms of standing
and walking he needs a cane for ambulation and balance, there's no
limitations in, in sitting, he can frequently bend, occasionally
kneel and stoop, should not crouch, balance or crawl.  There's no
manipulative handling limitations and . . . he should avoid
heights, big heights."  (R. 58.)  The ALJ also noted the individual
had a high school equivalency.  (R. 59.)  The VE responded that the
individual would be limited to the sedentary exertional level
because of the need to use a cane even while standing.  (*Id.*)  He
identified the positions of food and beverage order clerk,
semiconductor bonder, call-out operator, and conveyer line bakery
worker.  (R. 59, 62.)

15

ALJ Train then added that the hypothetical individual would need the opportunity to change position from sitting to standing every 40 to 45 minutes. (R. 60)  The VE responded that the positions previously identified could be done in either position so the individual can change positions whenever he feels like doing so. (*Id.*)

The next hypothetical added the need for a cane, "to either lean on the cane, lean on the table, a table, a chair or something, while he's standing . . . doing these jobs." (*Id.*)  The VE stated that the semiconductor bonder position would be eliminated because it required two hands but the individual could still do the other jobs. (*Id.*)

The fourth hypothetical asked about an individual who would have to move away from the worksite four or five times per day for five to ten minutes. (R. 63.)  The VE responded that the individual could not do the order clerk or conveyer line position but could do the call-out operator position and semiconductor bonder positions. (R. 63.)

The ALJ then asked if, "as a result of his medications, his depression, the voices, he's limited to unskilled work, would that affect his ability to do the jobs you previously enumerated?" (*Id.*)  The VE responded that these limitations would not preclude the occupations identified. (*Id.*)

Plaintiff's attorney questioned the VE about whether the

16

individual could sustain these jobs if he would be off task more than fifteen percent of the workday because he would not be able to focus or concentrate due to side effects of medications and mental impairments.  (R. 64.)  The VE answered that the individual would not be able to sustain employment because eighty-five percent is the minimum productivity required by employers so over fifteen percent off task exceeds the tolerance level.  (*Id.*)  The VE also testified that if the four or five breaks in hypothetical four were in addition to the typical breaks, the individual would not be able to sustain any gainful activity.  (R. 66.)

Plaintiff asked if he would make enough money to support himself if he were to get a job like one identified by the VE. (R. 66.)  The ALJ explained that this consideration was not part of the equation of whether he was entitled to benefits.  (R. 66-67.)

4.   **ALJ Decision**

By decision of September 27, 2013, ALJ Train determined that Plaintiff was not disabled as defined in the Social Security Act from the alleged onset date of June 28, 2011, through the date of the decision.  (R. 23.)  He made the following findings of fact and conclusions of law:

> 1.   The claimant has not engaged in substantial gainful activity since June 28, 2012, the application date (20 CFR 416.971 et seq.).
>
> 2.   The claimant has the following severe impairments: degenerative joint disease right foot and depression (20 CFR

17

416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) subject to the following.  He is able to carry 10 pounds frequently and 20 pounds occasionally.  He requires a sit/stand option every 40-45 minutes and use of a cane for ambulation and balance.  He has limited use of the right lower extremity for pushing/pulling; is limited to frequent bending and occasional kneeling, balancing and climbing; must avoid heights; and is limited to unskilled work that can be learned in 30 days or less.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born on January 23, 1965 and was 47 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-

18

> 41 and 20 CFR Part 404, Subpart P,
> Appendix 2).
>
> 9.   Considering the claimant's age,
>      education, work experience, and residual
>      functional capacity, there are jobs that
>      exist in significant numbers in the
>      national economy that the claimant can
>      perform (20 CFR 416.969 and 416.969(a)).
>
> 10.  The claimant has not been under a
>      disability, as defined in the Social
>      Security Act, since June 28, 2012, the
>      date the application was filed (20 CFR
>      416.920(g)).

(R. 17-23.)

As set out above, the ALJ concluded Plaintiff had the severe impairments of degenerative joint disease of the right foot and depression.  (R. 17.)  He noted that Plaintiff also had hypertension, diabetes, hyperlipidemia, and abdominal pain but the record did not support that these impairments were severe.  (*Id.*) He also found that the record did not support that the claimed impairments of PTSD and borderline intellectual functioning were severe on the basis that the records from Plaintiff's former psychiatrist did not include these diagnoses or treatment for these disorders. (*Id.*)  ALJ Train noted that he considered all of Plaintiff's impairments, including those nonsevere, when determining Plaintiff's RFC.  (*Id.*)

The ALJ concluded that the degenerative joint disease of the right foot did not meet listing 1.02 because the record did not establish that Plaintiff had an inability to ambulate effectively.

19

(*Id.*)  He stated that "[g]enerally, ineffective ambulation means having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held device(s) that limits function of both upper extremities (i.e., walker, two canes or two crutches)."  (*Id.*)   The ALJ added that Plaintiff "uses only a single cane and is able to carry out routine ambulatory activities.  He testified that he is able to walk three blocks without a cane, can shop leaning on a grocery cart, and could take public transportation such as a share-a-ride van."  (R. 17-18.)

The ALJ also concluded that Plaintiff's mental impairment did not meet or equal the criteria of listing 12.04.  (R. 18.)

ALJ Train determined that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible.  (R. 20.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[2]  It is necessary for the

---

[2]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate

---

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R. 22-23.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality

22

> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper."  *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an

23

exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v.*

*Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

**IV. Discussion**

*A. General Considerations*

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits.  *See Dobrowolsky*, 606 F.2d at 406.  Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim.  *Id.*  "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act."  *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).  As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence.  *Dobrowolsky*, 606 F.2d at 406.  Further, the court in *Dobrowolsky* noted "the cases

demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed."  *Id.*

**B.  *Plaintiff's Alleged Errors***

As set out above, Plaintiff alleges the following: 1) the ALJ erred by finding Plaintiff's multiple impairments to be "non-severe"; 2) the acting commissioner failed to sustain her burden of establishing that there is other work in the national economy that Plaintiff could perform; 3) substantial evidence does not support the ALJ's step three findings; and 4) the ALJ erred in assessing Plaintiff's credibility.  (Doc. 12 at 1-2.)

**1.   <u>Step Two Findings</u>**

Plaintiff first asserts that the ALJ erred by finding his multiple impairments to be "non-severe"--specifically asserting that the ALJ should have found his PTSD and schizoaffective disorders severe.  (Doc. 12 at 13-16.)  I disagree.

The ALJ stated that he found no conclusive evidence to support Plaintiff's counsel's assertion that Plaintiff's PTSD was a severe impairment.  (R. 17.)  The ALJ supports this determination with the statement that Plaintiff received the diagnosis after a single examination with a new psychiatrist in May 2013.  (*Id.* (citing Exhibit 21F).)  The cited exhibit includes Plaintiff's May 16, 2013, visit with Vassili V. Arkadiev, M.D., of T.W. Posessa &

26

Associates who diagnosed Schizoaffective Disorder and PTSD rather than the Major Depressive Disorder diagnosis of Plaintiff's long-term treating psychologist, Yury Yaraslavsky, M.D.  (R. 267, 419.) Dr. Yaraslavsky's diagnosis remained Major Depressive Disorder from his first meeting with Plaintiff in February 2012 through January 2013.  (R. 267, 409.)  During this period of time he saw Plaintiff regularly and he assessed the Major Depressive Disorder to be severe at the outset and moderate as of January 2013.  (*Id.*)  The Major Depressive Disorder was rated severe in February, April and May of 2012.  (R. 262, 264, 267.)  In July, September, and November 2012 and January and March 2013, it was rated moderate.  (R. 302, 407, 409, 411.)

Because Plaintiff's long-term treating psychiatrist did not diagnose PTSD or Schizoaffective Disorder, and because Dr. Arkadiev saw Plaintiff only once, the ALJ appropriately discounted the one-time diagnosis.  Because the Dauphin County Prison records do not provide an analysis or significant support for the diagnoses identified in the June and July 2013 mental health records (R. 428, 441), they do not undermine the ALJ's finding or support Plaintiff's assertion that his PTSD and Schizoaffective Disorder were severe impairments.

Furthermore, as argued by Defendant, this claimed error is not cause for remand because the ALJ found in favor of Plaintiff at step two and continued his analysis to step five, considering all

27

of Plaintiff's credibly established limitations in deciding Plaintiff's RFC.  (Doc. 14 at 14-16 (citing *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.5 (3d Cir. 2007)).)[3]

## 2.   **Step Five Determination**

Plaintiff alleges that Defendant failed to sustain her burden of establishing that there is other work in the national economy that Plaintiff could perform.  (Doc. 12 at 17.)  I disagree.

As set out above, at step five the ALJ must determine whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. § 404.1520(a)(4)(v).  The Acting Commissioner has the burden of showing that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work

---

[3]  In conjunction with this step two claimed error, Plaintiff asserts that the ALJ did not properly discuss GAF scores.  (Doc. 12 at 15-16 (citing R. 21).)  This assertion requires no further discussion in that Plaintiff's claim is merely conclusory. Further, the quotation cited was made in the context of the ALJ's RFC determination, not his step two decision regarding non-severe mental impairments.

Similarly, Plaintiff does not provide adequate support for his assertion that the ALJ should have sent Plaintiff to a psychological consultative examiner.  (*See* Doc. 12 at 16.)  As argued by Defendant, the regulations provide that a consultative examination *may be requested* if the claimant's medical sources cannot or will not give sufficient evidence about an impairment and *may be required* if the evidence is not sufficient to support a decision on the claim.  (Doc. 14 at 18-19 (citing 20 C.F.R. §§ 404.1517, 404.1519a(b)).)  Here the ALJ did not determine that the record did not contain sufficient evidence to support a decision on Plaintiff's claim.

experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

Plaintiff asserts that even with the sit/stand option described by the ALJ, the VE was given inadequate information to conclude that Plaintiff could perform the jobs of call-out operator, semiconductor bonder, food and beverage clerk and conveyer line bakery worker because SSR 96-9p requires specificity as to the duration of the sit/stand option. (Doc. 12 at 17.) Plaintiff relates this assertion to considerations of the extent to which the occupational base is eroded and also faults the ALJ for failing to note the significant erosion caused by the use of a cane and Plaintiff's limitations in his ability to sit, stand, and walk. (Doc. 12 at 17-18.)

Contrary to Plaintiff's assertions, the ALJ's hypotheticals included the durational component of the sit/stand option (R. 60) and, "in terms of standing and walking," the use of a cane for ambulation and balance (R. 60). The VE acknowledged these limitations and, therefore, his responses considered the erosion of the sedentary occupational base caused by the limitations identified in the hypothetical. (R. 58-60.) Given that an ALJ is not required to cite rulings or use specific language in his analysis, *Holiday v. Barnhart*, 76 F. App'x 479, 482 (3d Cir. 2003), this claimed error is not cause for remand.

3.   **Step Three Findings**

Plaintiff alleges that substantial evidence does not support the ALJ's step three findings because he erred in concluding that Plaintiff does not meet or equal Listing 1.02 which pertains to major dysfunction of a joint.  (Doc. 12 at 19.)  I disagree.

Plaintiff apparently recognizes that to meet or equal Listing 1.02, he must show involvement of one major peripheral weight-bearing joint resulting in an inability to ambulate effectively as defined in Section 1.00B2b.  (Doc. 12 at 19.)  However, Plaintiff does not attempt to show how his right foot/ankle problem satisfies the definition in either his supporting or reply brief.  (*See* Docs. 12, 14.)  He cites the ALJ's finding that

> "the record does not establish the claimant has an ability to ambulate effectively. Generally, ineffective ambulation means having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held device(s) that limits function of both upper extremities (i.e., walker, two canes or two crutches). The claimant uses only a single cane and is able to carry out routine ambulatory activities."

(Doc. 12 at 21-22 (quoting R. 17).)  In a conclusory fashion, Plaintiff states that "[t]his is clearly error of law and not supported by substantial evidence."  (Doc. 12 at 22.)  Plaintiff does not refute the requirements set out by the ALJ--he does not identify the "error of law."  He must do far more to sustain his

30

burden.

Further, I conclude that he would be unable to do so here.  As
set out by Defendants, under Listing 1.02B Plaintiff was required
to meet Section 1.00B2b.  (Doc. 14 at 22.)

>           b.   What we mean by inability to ambulate
>                effectively.
>
>           (1) Definition.  Inability to ambulate
>           effectively means an extreme limitation of
>           the ability to walk; i.e., an impairment(s)
>           that interferes very seriously with the
>           individual's ability to independently
>           initiate, sustain, or complete activities.
>           Ineffective ambulation is defined generally
>           as having insufficient lower extremity
>           functioning (see 1.00J) to permit independent
>           ambulation without the use of a hand-held
>           assistive device(s) that limits the
>           functioning of both upper extremities.
>           (Listing 1.05C is an exception to this
>           general definition because the individual has
>           the use of only one upper extremity due to
>           amputation of a hand.)
>
>           (2) To ambulate effectively, individuals must
>           be capable of sustaining a reasonable walking
>           pace over a sufficient distance to be able to
>           carry out activities of daily living.  They
>           must have the ability to travel without
>           companion assistance to and from a place of
>           employment or school.  Therefore, examples of
>           ineffective ambulation include, but are not
>           limited to, the inability to walk without the
>           use of a walker, two crutches or two canes,
>           the inability to walk a block at a reasonable
>           pace on rough or uneven surfaces, the
>           inability to use standard public
>           transportation, the inability to carry out
>           routine ambulatory activities, such as
>           shopping and banking, and the inability to
>           climb a few steps at a reasonable pace with
>           the use of a single hand rail.  The ability

> to walk independently about one's home
> without the use of assistive devices does
> not, in and of itself, constitute effective
> ambulation.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B2b. As stated by the ALJ and pointed out be Defendant, Plaintiff uses only a single cane, and could carry out routine ambulatory activities, including that he is able to walk three blocks without his cane, shop, and take public transportation. (R. 18; Doc. 14 at 23.) Therefore, given the requirements of § 1.00B2b, the evidence of record regarding Plaintiff's ambulation, and Plaintiff's failure to sustain his burden of showing the ALJ erred at step three, this claimed error is without merit.

## 4. **Credibility**

Plaintiff's final claimed error is that the ALJ erred in assessing his credibility because ALJ Train did not do a legally correct pain analysis in that he did not apply the factors required by 20 C.F.R. § 416.929(c) and SSR 96-7p and his assessment is not based on substantial evidence. (Doc. 12 at 22.) I disagree.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'" *Coleman v. Commissioner of Social Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)). "Credibility

determinations are the province of the ALJ and should only be
disturbed on review if not supported by substantial evidence."
*Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D.
Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873
(3d Cir. 1983)).

   An ALJ is not required to specifically mention relevant Social
Security Rulings.  *See Holiday*, 76 F. App'x at 482.  It is enough
that his analysis by and large comports with relevant provisions.
*Id.*

   Social Security Ruling 96-7p provides the following guidance
regarding the evaluation of a claimant's statements about his or
her symptoms:

> In general, the extent to which an
> individual's statements about symptoms can be
> relied upon as probative evidence in
> determining whether the individual is
> disabled depends on the credibility of the
> statements.  In basic terms, the credibility
> of an individual's statements about pain or
> other symptoms and their functional effects
> is the degree to which the statements can be
> believed and accepted as true.  When
> evaluating the credibility of an individual's
> statements, the adjudicator must consider the
> entire case record and give specific reasons
> for the weight given to the individual's
> statements.

SSR 96-7p.  "One strong indication of the credibility of an
individual's statements is their consistency, both internally and
with other information in the case record."  SSR 96-7p.

The Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529. First, symptoms such as pain, shortness of breath, and fatigue will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. § 404.1529(b). Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work. *Id.* In so doing, the medical evidence of record is considered along with the claimant's statements. *Id.*

The regulations provide that factors which will be considered relevant to symptoms such as pain are the following: activities of daily living; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medications taken to alleviate symptoms; treatment received other than medication intended to relieve pain or other symptoms; other measures used for pain/symptom relief; and other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-

34

vii).

Although Plaintiff alleges that the ALJ failed to consider evidence supporting Plaintiff's allegations (Doc. 12 at 23-25), the ALJ explained the relevant two-step process and noted studies and examinations which supported Plaintiff's allegations of pain (R. 19-22). Importantly, "[t]here is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record," *Hur*, 94 F. App'x at 133. Regarding Plaintiff's averment that the ALJ's credibility analysis ran afoul of the relevant regulation and ruling, the ALJ did not disregard Plaintiff's complaints of pain and medication side effects but found Plaintiff's allegations were not fully supported by medical evidence, Plaintiff's testimony, and activities of daily living. (R. 20-22.) Therefore, the ALJ did not run afoul of relevant provisions and I cannot conclude that his RFC determination is not supported by substantial evidence.

## V. Conclusion

For the reasons discussed above, Plaintiff's appeal of the Acting Commissioner's decision is properly denied. An appropriate Order is filed simultaneously with this action.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: November 9, 2015

35